## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Carlos Robanne Lo, on behalf of himself and
others similarly situated,

       Plaintiff,     **CIVIL ACTION NO.: 0:20-cv-61319**

  v.

Management Health Systems, LLC d/b/a
MedPro Staffing,

     Defendant.

_____

## PLAINTIFF'S CLASS ACTION COMPLAINT AND JURY DEMAND

Carlos Robanne Lo ("Plaintiff" or "Lo"), by and through his attorneys and on behalf of

himself, the Class set forth below, and in the public interest, brings this Class Action Complaint

against Management Health Systems, LLC d/b/a MedPro Staffing ("Defendant" or "MedPro"),

seeking relief for Defendant's violations of the Trafficking Victims Protection Act ("TVPA"), 18

U.S.C. § 1589 *et seq*.

## INTRODUCTION

1.  This case is about labor trafficking. Defendant is a foreign labor recruiter who

purports to recruit nurses from abroad to work in healthcare facilities throughout the United States.

2.  In reality, Defendant's operations and the circumstances surrounding the nurses'

work for Defendant result in what is essentially indentured servitude. After getting nurses to sign

a non-negotiable contract agreeing to work for Defendant, and **after** bringing them to the United

States to work, Defendant informs nurses that they are subject to up to a $40,000 penalty if they

leave before their three-year employment term is up.

3.      Additionally, Defendant threatens its nurses with legal action to keep them working for Defendant.

4.      Defendant has made good on these threats and, in fact, has sued several nurses for daring to leave Defendant and seek other work.

5.      Through this scheme, Defendant seeks to continue to profit from the nurses' labor under Defendant's contracts with the various healthcare facilities at which the nurses work. This lawsuit seeks to end Defendant's illegal practices and to compensate the victims of those practices.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this matter arises under the laws of the United States, and pursuant to 18 U.S.C. § 1595, which provides that civil actions under the TVPA may be brought in an appropriate district court of the United States.

7.      This Court has personal jurisdiction over Defendant, and venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Florida and Defendant's headquarters are within the Southern District of Florida.

## PARTIES

8.      Plaintiff is a Registered Nurse employed by Defendant. He is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. He lives in Texas.

9.      Defendant is a limited liability company with a business address of 1580 Sawgrass Corporate Parkway, Suite 200, Sunrise, Florida 33323.

## FACTS

### Defendant's Business

10.     Defendant is one of the largest healthcare staffing firms in the United States.

11.     In addition to Florida, Defendant also operates a business location in Compound Las Pinas, Philippines.

12.     Defendant has operated and done business under the following trade names: MedPro Healthcare Staffing, MedPro Staffing, Medpro International, and MedproU.

13.     Defendant's business involves recruiting foreign-educated healthcare professionals from the Philippines, among other countries, bringing them to the United States, and selling their labor to healthcare facilities.

14.     Since 1983, Defendant has placed thousands of nurses, therapists, medical technologists and other healthcare professionals across the United States, including hospitals, outpatient facilities, skilled nursing facilities, physicians' offices, and home health companies.

15.     Defendant profits by selling the healthcare workers' labors to healthcare facilities. Through its work with recruiters, Defendant is fed a steady stream of nurses seeking to work in the United States. Plaintiff was one such nurse.

16.     Defendant assures foreign healthcare recruits that it will help them "realize their American dream" and assist them in "bringing [their] American dream to life."

17.     Defendant also heavily markets "Medpro University," assuring recruits that its "U.S. assimilation training will provide [them] essential skills for [their] new life in the U.S."

18.     In exchange for allegedly helping nurses like Plaintiff "realize their American Dream," Defendant requires its recruits to sign an employment agreement for a three-year term, and only **after** their arrival to the United States, does Defendant inform its nurses that they will suffer a severe financial penalty up to $40,000 if they choose to work somewhere else.

**Defendant's Unlawful Penalties**

19.     After receiving a job offer from Defendant, Defendant emailed its form contract to Plaintiff for signature, which he signed on or about October 6, 2017.

20.     Defendant gave no indication to Plaintiff that the contract was negotiable. Further, Defendant did not advise Plaintiff to consult with an attorney about the contract.   Plaintiff understood that the contract was offered on a take it or leave it basis.

21.     Defendant's form contract—the contract Plaintiff signed—states that, if a nurse does not complete their three-year employment term, they will owe Defendant actual damages incurred, including certain costs and expenses, which the contract states shall be determined by a "United States District Court Certified Mediator." Notably, it is only **after** nurses arrive in the United States to start work that Defendant tells them that they will owe Defendant **$40,000** if they leave before their employment term is completed, with the amount prorated for years worked (i.e., a nurse would owe approximately $26,666 after working one year, $13,333 after working two years).

22.     For example, **after** Plaintiff arrived in the United States, at an orientation meeting, Defendant for the first time informed Plaintiff of the amount of the monetary penalty. Numerous other new recruits were present at that orientation.

23.     The $40,000 penalty is not provided for in Plaintiff's Employment Agreement.

24.     At the time Plaintiff signed his Employment Agreement, he had no idea he could be liable for up to $40,000.

25.     There is no possibility that the penalty is instead contractual liquidated damages.

26.     The penalty is not provided for in the contract and does not manifest the parties' intention.

27.     If Defendant actually suffered any damages from a nurse leaving before completing the period of involuntary servitude, those damages would be easily calculable.

28.     Additionally, the $40,000 penalty is unreasonable and disproportionate to any actual damages suffered by Defendant.

29.     Defendant does not make any attempt to calculate actual damages.

30.     Instead, Defendant imposes this universal and not previously disclosed penalty amount in an attempt to force nurses to work for a three-year term.

31.     When Plaintiff arrived in Florida in January 2018, Defendant placed him in a two-bedroom apartment with five other people he did not know.

32.     Plaintiff initially came to the United States without his family and did not have any close friends.

33.     Accordingly, he did not travel much but if he did, Plaintiff notified Charity, Defendant's Journey Guide.

34.     After about two months, Defendant initially assigned Plaintiff to work in Brenham, Texas.

35.     Defendant told Plaintiff he would remain in Brenham for three years so Plaintiff brought his family to the United States, got involved in the community, and began establishing relationships. For example, Plaintiff and his family also got involved with the local Filipino community and joined a church in or near Brenham. They planned and started to set down roots for their family.

36.     Despite its prior representation, Defendant reassigned Plaintiff to Waco, Texas, before the expiration of the three-year period.

37.     Plaintiff asked Defendant to remain in Brenham but Defendant denied his request.

38.     Plaintiff did not want to move to Waco, Texas given his family's connection to the Brenham community; however, Plaintiff felt he had no choice but to follow MedPro's direction and move to Waco.

**Defendant's Abuse of Legal Process**

39.     Not only does Defendant fail to disclose the steep financial penalty to nurses before they arrived in the United States, but Defendant also fails to explain that it will sue nurses for daring to leave without paying the penalty.

40.     In fact, Defendant reinforces and intimidates the nurses with the threat of suit throughout the nurses' employment.

41.     Plaintiff and the other nurses are aware that Defendant has, in fact, carried through with such threats in an attempt to force nurses to continue to work for Defendant.

42.     Defendant has sued and continues to sue nurses who leave without paying the penalty.

43.     As one example, Defendant commenced a lawsuit against former nurse Eden Selispara in Broward County Circuit Court, Case No. CACE-17-010509. Selispara counterclaimed, alleging that Defendant breached her contract, threatened to make a baseless report of fraud to immigration officials, and demanded over $150,000 from Selispara if she wanted to be released from Defendant's control.

44.     Defendant and Selispara ultimately reached a settlement in August 2018, under which Defendant agreed, among other things, that: (a) it would not mention potential litigation or its litigation history for the purpose of coercing or threatening a health care professional to continue to work; and (b) it would only seek to recover actual damages for healthcare workers that left before the end of the three-year term and any recovery would be capped at $40,000.

45.     The Settlement Agreement provides that the above-referenced policies "shall be for the benefit of any current or future actual or prospective employees" and "shall remain in effect for 5 years from the effective date."

46.     Defendant has not disclosed the terms of the Selispara Settlement Agreement to Plaintiff or other recruits.

47.     And, as to the Selispara Settlement Agreement, Defendant has failed to uphold its end of the bargain.

48.     Contrary to the terms of Plaintiff's Employment Agreement and the Settlement Agreement, which both allow Defendant to collect its **actual damages** incurred, Defendant makes no attempt to calculate actual costs and, instead, simply charges the $40,000 cap which is nowhere near Defendant's actual damages and which is not disclosed until after nurses sign the contract and arrive in the United States. Instead, Defendant continues to threaten a serious financial penalty in an attempt to force nurses like Plaintiff to continue working.

49.     For example, when Plaintiff expressed his desire in or about August 2018 to seek new employment, Iris Cruz from Defendant's legal department told Plaintiff that he would have to pay Defendant approximately $27,000 and would be sued if he failed to continue working for Defendant.

50.     At no time did Ms. Cruz advise Plaintiff he had a right to seek counsel.

51.     Plaintiff decided to stay with Defendant following this discussion. In the Spring of 2019, when Plaintiff inquired about the possibility of seeking new employment, Manager Christi Bick told Plaintiff that if he ended his employment with Defendant, he would have 24 months remaining in his employment term and would be liable to pay damages of $26,667.

52.     Ms. Bick further warned Plaintiff that:

    a.   the money Plaintiff would have to pay Defendant would come out of his after-tax earnings and that in order to pay Defendant $26,667, he would have to earn about $40,000 in new wages, and;

    b.   on top of the steep financial penalty, if Plaintiff breached his contract, he would not be leaving Defendant "in good standing," he would forfeit any remaining unused PTO hours, and he would be ineligible for employment verification from Defendant in the future.

53. Additionally, in bold and underlined print, Ms. Bick threatened Plaintiff that "[r]egardless of breach, there are a number of provisions in [his] Employment Agreement that live on beyond the last day of [his] employment," referencing Defendant's non-solicitation provision and evolving active client roster.

54. Among other things, the referenced Employment Agreement restricts Plaintiff from contacting or otherwise soliciting the facility, clients or patients of Defendant or the patients of any of Defendant's clients for the purposes of providing services.

55. The agreement provides that this non-solicitation provision applies from the date Plaintiff signed the agreement to Plaintiff's start date, during the Employment Term, and for a two-year period after termination of Plaintiff's employment term.

56. In addition to a non-solicitation provision, Defendant also prohibits Plaintiff from working with any other entity or individual to locate, identify, and secure work in the United States for a period of one year after the effective date of the agreement, unless Defendant unilaterally decides to give permission in writing.

57. On or about March 18, 2019, Plaintiff emailed Ms. Bick and explained to her that he wanted to accept an offer from another potential employer paying $38/hour, which was nearly 1.5 times more than he was paid by Defendant.

58. Ms. Bick expressed her disappointment and said that her "advise to all Explorers is to honor your commitment, so you do not have to pay any unnecessary damages for leaving early."

59.     In an email correspondence, Ms. Bick further explained that if Plaintiff chose to leave Defendant early and he did not comply with the terms of any applicable agreement between the parties, it would result in separate legal actions against Plaintiff. Ms. Bick copied Defendant's legal counsel on this email.

60.     Following these communications, Plaintiff again decided he could not leave despite the higher paying job opportunities.

61.     In January 2020, Plaintiff contacted Defendant's Journey Guide, Charity Capistrano, and inquired about how much he would have to pay Defendant if he took a new job that paid better than Defendant.

62.     Ms. Capistrano told Plaintiff that since he had 14 months left of his 3-year term, he would still owe Defendant $15,556.

63.     Because of the severe financial penalty and repeated threats of litigation, Plaintiff has turned down more lucrative employment offers and effectively restrained Plaintiff from leaving Defendant.

64.     The threat of severe financial harm through the penalty and possible lawsuit creates a situation where nurses—including Plaintiff—are working under duress. The penalty and threat of a lawsuit coerce Plaintiffs and the other nurses into continued work for Defendant.

65.     There are reasons that Plaintiff and the other nurses would want to terminate their employment with Defendant.

66.     The nurses have no freedom to move to new or better jobs.

67.     Because of this, Plaintiff feels like he is the equivalent of an indentured servant to Defendant and experiences anxiety, fear, and distress.

68.     As a result of Defendant's illegal trafficking conduct, Plaintiff has suffered emotional distress as well as out-of-pocket damages associated with higher paying work.

69.     Defendant, on the other hand, has profited. Defendant bills health care providers for the services of nurses like Plaintiff at a much higher rate that it pays the nurses themselves.

70.     Defendant discourages Plaintiff and other nurses from discussing pay.

71.     This prevents the nurses from learning whether they are paid fairly.

72.     Defendant also charged Plaintiff for certain out-of-pocket costs.

73.     By way of example, Defendant required Plaintiff to take paid driving lessons from A-1 Driving School when he arrived in the United States despite the fact that Plaintiff had been driving for years.

74.     Plaintiff paid about $100 for two hours of training.

75.     Plaintiff remains employed by Defendant and is not permitted to leave until approximately March 2021.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

77.     Plaintiff asserts his claims on behalf of the Class defined as follows:

All nurses who entered the United States through Defendant's recruitment process within ten years prior to the filing of this action and who signed a contract substantially similar to the contract Plaintiff signed, where the contract did not disclose the monetary penalty associated with leaving Defendant's employ before the end of the "employment term."

78.     <u>Numerosity</u>: The Class is so numerous that joinder of all class members is impracticable. According to Defendant's website, it has placed thousands of foreign-educated nurses in the United States.[1] These members can be identified based on Defendant's records.

79.     <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members, including but not limited to:

    a.  Whether Defendant obtains the labor of foreign nurses by using serious harm in violation of the TVPA;

    b.  Whether Defendant obtains the labor of foreign nurses by threatening serious harm in violation of the TVPA;

    c.  Whether Defendant obtains the labor of foreign nurses through a plan to make nurses fear serious harm in violation of the TVPA;

    d.  Whether Defendant obtains the labor of foreign nurses through abuse of legal process in violation of the TVPA;

    e.  Whether Defendant has attempted to force labor of foreign nurses through the means listed above;

    f.  Whether Defendant knowingly recruits nurses and knowingly benefits by its violations of the TVPA; and

    g.  The proper measure of punitive damages.

These questions arise, in part, because of the uniform circumstances under which Plaintiff and the Class worked. These include working under the same threat of being sued and facing serious financial harm.

80.     <u>Typicality</u>: Plaintiff's claims are typical of the members of the Class for precisely the reasons set forth above. Defendant uses a uniform contract, making Plaintiff's contract typical of that of the Class. Further, Defendant treated Plaintiff consistent with other Class members, in

---

[1] Available at https://www.medprointernational.com/about-us/ (last visited June 12, 2020).

accordance with its standard policies and practices. And, Defendant's position is that its severe monetary penalty applies to each and every nurse, regardless of individual circumstance.

81.     <u>Adequacy</u>:  Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to the prosecution of this action and has retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts between Plaintiff and the Class he seeks to represent.

82.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant uses a uniform contract and uniform policies and practices, resulting in common violations of law. Similarly, as to the claim that Defendant attempted to force labor, Defendant's actions such as charging a penalty and threatening suit— which it uniformly undertook as to each member of the putative class—predominate. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum, and Defendant's contract selects this forum for resolving disputes.

83.     Plaintiff intends to send notice to all members of the Class to the extent required by Fed. R. Civ. P. 23. The names and addresses of the Class members are available from Defendant's records.

## COUNT I

### Violation of the Trafficking Victims Protection Act (TVPA)
### 18 U.S.C. § 1589(a)
### (On behalf of Lo and the Class)

84.     Plaintiff incorporates the above allegations by this reference.

85.     It is a violation of the TVPA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

86.     The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious  .  .  .  to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

87.     Defendant obtained the labor of Lo and the Class members through threats of serious harm, through a scheme to make Lo and the Class believe they would suffer serious harm, and through abuse and threatened abuse of legal process.

88.     Defendant kept Lo and the Class working for it against their wills with the contract's term of indentured servitude, with an unenforceable monetary penalty and threats of litigation.

89.     Defendant's use of such means to obtain the labor of Lo and the Class was knowing and intentional.

90.     Lo and the Class suffered damages as a result of Defendant's conduct. Those damages include emotional distress, lost job opportunities, and other damages.

91.     Lo and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT II

**Violation of the Trafficking Victims Protection Act (TVPA)**
**18 U.S.C. § 1589(b)**
**(On behalf of Lo and the Class)**

92.     Plaintiff incorporates the above allegations by this reference.

93.     It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

94.     Defendant has knowingly benefited from its participation in the forced labor venture described herein by earning substantial profits from the venture.

95.     Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

96.     Lo and the Class suffered damages as a result of Defendant's conduct. Lo and the Class suffered damages as a result of Defendant's conduct. Those damages include emotional distress, lost job opportunities, and other damages.

97.     Lo and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT III

**Violation of the Trafficking Victims Protection Act (TVPA)**
**18 U.S.C. § 1590(a)**
**(On behalf of Lo and the Class)**

98.     Plaintiff incorporates the above allegations by this reference.

99.     It is a violation of the TVPA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPA.

100.    Defendant knowingly recruited Lo and Class members in violation of the TVPA through the means described herein without disclosing to them that they would be trapped by the severe monetary penalty.

101.    Lo and the Class suffered damages as a result of Defendant's conduct. Those damages include emotional distress, lost job opportunities, and other damages.

102.    Lo and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT IV**

**Violation of the Trafficking Victims Protection Act (TVPA)**
**18 U.S.C. § 1594(a)**
**(On behalf of Lo and the Class)**

103.    Plaintiff incorporates the above allegations by this reference.

104.    Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

105.    Thus, even if Defendant was unsuccessful at forcing its workers to continue to work for it, Defendant would still be liable under the TVPA for attempting to force labor.

106.    Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

107.    Specifically, Defendant has attempted (and continues to attempt) to force labor given its penalty provision and repeated threats of and abuse of the legal process.

108.    Defendant's attempts violate the TVPA.

109.    Lo and the Class suffered damages as a result of Defendant's conduct. Those damages include emotional distress, lost job opportunities, and other damages.

110.    Lo and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief as follows:

A.    determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3);

B.    designating Plaintiff as representative for the Class and designating Plaintiff's counsel as counsel for the Class;

C.    issuing proper notice to the Class at Defendant's expense;

D.    declaring that Defendant committed violations of the TVPA;

E.    awarding damages as provided by the TVPA, including punitive damages;

F.    awarding reasonable attorneys' fees and costs as provided by law; and

G.    granting further relief, in law or equity, as this Court may deem appropriate and just.

Dated:     July 1, 2020

**VARNELL & WARWICK**

/s/ Janet R. Varnell
Janet R. Varnell (FL Bar No. 0071072)
1101 E. Cumberland Ave., Suite 201H, #105
Tampa, Florida 33602
Tel: (352) 753-8600
Fax: (352) 504-3301
jvarnell@varnellandwarwick.com
kstroly@varnellandwarwick.com

**NICHOLS KASTER, PLLP**
*Anna P. Prakash (MN Bar No.0351362)
*Charles A. Delbridge (MN Bar No. 0386639)
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 338-4878
aprakash@nka.com
cdelbridge@nka.com
**Pro Hac Vice* Motion forthcoming

**ATTORNEYS FOR PLAINTIFF**